UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| WEBASTO ROOF SYSTEMS, INC.<br><br>                        Plaintiff,<br><br>v.<br><br>METEOR SEALING SYSTEMS, LLC,<br><br>                       Defendant. | Case No. 26-10141<br>Honorable F. Kay Behm<br>Magistrate Judge Curtis Ivy, Jr. |

**ORDER GRANTING PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER (ECF NO. 6)**

### I.     Introduction

Plaintiff Webasto Roof Systems, Inc. ("Webasto") seeks an emergency temporary restraining order ("TRO") to maintain the status quo of an automotive parts supply chain pending the resolution of the contract dispute between Webasto and its supplier, defendant Meteor Sealing Systems, LLC ("Meteor"). ECF No. 6. Under the Court's accelerated briefing schedule, Webasto's emergency motion has been fully briefed, ECF Nos. 7, 8, and the Court shall decide the motion without a hearing. *See* E.D. Mich. LR 7.1 (f)(2). Although Webasto may not ultimately succeed

on the merits of its anticipatory breach claim against Meteor, current Michigan law supports its position. Further, Webasto will undoubtedly suffer irreparable harm without immediate injunctive relief. Accordingly, the Court will grant Webasto's emergency motion and issue a TRO.

## II.  Background

Webasto is a Tier 1 automotive supplier providing sunroof and convertible systems to original equipment manufacturers ("OEM") including Ford Motor Co., General Motors, Stellantis, and Audi, among others. ECF No. 5. Meteor operates as a Tier 2 automotive supplier providing certain component parts ("Parts") essential to the manufacture of Webasto's sunroof and convertible systems. *Id*. According to Webasto, Meteor is the sole supplier of these Parts.

Meteor supplies the Parts to Webasto under the terms of the Purchase Order 605184 ("PO") and the expressly incorporated General Terms and Conditions of Purchase ("General Terms"). ECF Nos. 5-3, 5-4. Under the terms of the PO, "Webasto agrees to purchase between 65% to 100% of its requirements from [Meteor] for the duration of the" agreement. ECF No. 5-3.

On January 12, 2026, Meteor informed Webasto that it would immediately discontinue shipment of Parts unless Webasto agreed to pay a 100% price increase. ECF No. 5-8. Webasto filed this action the following day, claiming repudiation and breach of contract and seeking specific performance of the PO and temporary, preliminary, and permanent injunctive relief. ECF No. 1-2. After Meteor removed the action to this Court, Webasto amended its complaint and filed the instant emergency TRO motion. ECF Nos. 1, 5, 6. Without Parts from Meteor, Webasto's production lines have or will imminently shut down. ECF No. 5. Without Webasto's products, OEM shutdowns are expected as early as today. *Id*.

### III.   Analysis

Four factors are important in determining whether a temporary restraining order is appropriate: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Cooper-Standard Automotive, Inc. v. Daikin America, Inc.*, 568 F. Supp. 3d 846, 850-51 (E.D. Mich. 2021); *see also E.V. v. Raycraft*, 2025 WL 2938594, at

*5 (N.D. Ohio Oct. 16, 2025) ("standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo").

### A. Likelihood of Success on the Merits

A likelihood of success on the merits may be shown "if the plaintiff has raised questions going to the merits" that are "serious, substantial, difficult and doubtful" enough "to make them fair ground for litigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (internal quotations omitted). To prevail on its breach of contract claim, Webasto must establish "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 829 (2016) (citing *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95 (2014)). The crux of the parties' dispute, and the critical issue in assessing whether Meteor has breached its contract with Webasto, is determining whether the PO constitutes a binding, ongoing "requirements contract," as Webasto argues, or a "release-by-release" agreement, as Meteor argues.

A requirements contract "is a contract that defines quantity by reference to the buyer's requirements." *MSSC, Inc. v. Airboss Flexible Prod. Co.*, 999 N.W.2d 335, 339 (Mich. 2023). It is created by an "umbrella agreement" that dictates the terms of future transactions, including the quantity ("the buyer will obtain a set share of its total need from the seller"). *Id*. The buyer will then issue releases to inform the seller of its specific, short-term needs. *Id*. at 340.

In contrast, release-by-release agreements are agreements that generally "govern[ ] the terms of future contract offers." *Id*. "[T]he seller is bound by the terms agreed to in the purchase order when future releases are issued and accepted." *Id*. Release-by-release agreements are not, on their own, enforceable contracts. A requirements contract obligates the buyer to make purchases from the seller, while a release-by-release contract allows either party to discontinue the relationship after individual transactions are completed. *Id*. A requirements contract must contain a suitable quantity term, while a release-by-release agreement's quantity term is supplied by each release.

Here, the parties' disagreement hinges on whether "65%-100% of its requirements" is a sufficiently specific quantity term to create a requirements contract.

Michigan courts have provided confusing, perhaps contradictory, guidance on what constitutes a suitably specific quantity term to create a requirements contract. In 2020, the Michigan Court of Appeals determined that a contract obligating the buyer to purchase between one part and 100% of buyer's requirements was a requirements contract. *Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys., LLC*, 952 N.W.2d 576, 583-84 (Mich. Ct. App. 2020). Although courts within this district have suggested that *Airboss* overruled *Cadillac Rubber*, *see, e.g., Ultra Mfg. (USA) Inc., v. ER Wagner Mfg. Co.*, 713 F. Supp. 3d 394, 398 (E.D. Mich. 2024); *FCA US, LLC v. MacLean-Fogg Component Solutions LLC*, a recent Michigan Court of Appeals case specifically rejects the view that *Airboss* irreconcilably conflicts with *Cadillac Rubber*. *FCA US LLC v. Kamax Inc.*, 2025 WL 1420392, at *3-4, ___ N.W.3d ___ (Mich. Ct. App. 2025), *appeal granted*, 26 N.W.3d 430 (Mich. 2025).

> *Airboss* and *Cadillac Rubber* are distinguishable and do not conflict. The contract in *Cadillac Rubber* provided "that Buyer shall purchase no less than one piece or unit of each of the Supplies and no more than one hundred percent (100%) of

Buyer's requirements for the Supplies." In *Airboss*, in contrast, the contracts contained no minimum term. Here, because the contract at issue requires FCA to purchase between 65% and 100% of its needs from Kamax, *Cadillac Rubber* governs, not *Airboss*. Under the reasoning in *Cadillac Rubber*, the purchase order's language providing for a quantity between 65% and 100% constituted a proper quantity term for a nonexclusive contract under MCL 440.2201(1). As a result, parol evidence can be used to determine the parties' intent as to the existence of a requirements contract. We therefore conclude that *Cadillac Rubber* is the controlling authority.

*Kamax* specifically ruled that a term requiring a seller to provide between 65% and 100% of a buyer's needs constituted a proper quantity term under M.C.L. 440.2201(1) such that parol evidence[1] can be used to determine the parties' intent as to the existence of a requirements contract. "[I]n the absence of any persuasive data that the Michigan Supreme Court would decide" the issue differently, federal courts are " 'not at liberty to depart from the state appellate court's resolution' of this issue of state law." *Hampton v. United States*, 191 F.3d 695, 701 (6th Cir. 1991) (quoting *Hicks v. Feiock*, 485 U.S. 624, 629 (1988)). Because *Kamax* held that

---

[1] The parties do not address whether parol evidence would establish that the PO is a requirements contract. For the purposes of this motion, the Court assumes that the parties' pattern and practice demonstrates that the PO is a requirements contract. The parties may address this issue in the additional briefing and hearing on the motion for preliminary injunction.

"approximately 65%-100% of [buyer's] requirement" is a suitable quantity term, the Court is satisfied that Webasto has raised questions going to the merits" that are "serious, substantial, difficult and doubtful" enough to satisfy the likelihood of success on the merits factor.

### B. Irreparable Harm and Other Factors

In addition to establishing a likelihood of success on the merits, plaintiffs seeking injunctive relief must demonstrate that they are likely to suffer irreparable harm in the absence of preliminary injunctive relief, that an injunction will not result in substantial harm to others, and that an injunction is in the public interest. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024). "A showing of probable irreparable harm is the single most important prerequisite to granting injunctive relief." *Cooper-Standard*, 568 F. Supp. 3d at 852 (quoting *Lucero v. Detroit Public Schools*, 160 F. Supp. 2d 767, 801 (E.D. Mich. 2001) (cleaned up). A party's harm is "irreparable" when it cannot be adequately compensated by money damages. *Id*.

"The 'just-in-time' nature of the automotive supply chain provides potential for large-scale disruption if just one of the down-line companies is unable to fulfill its obligations under contract." *Id.* at 853. "[T]he potentially

catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court." *Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2012). Irreparable harm is found where a plaintiff's goodwill and business reputation would suffer absent injunctive relief. *See TRW Inc. v. Indus. Sys. Assoc. Inc.*, 47 F. App'x 400, 401 (6th Cir. 2002).

Webasto asserts that, without Parts from Meteor, its own assembly lines will shutdown which, in turn, will cause the almost immediate shutdown of its OEM customers' assembly lines. Webasto's inability to supply sunroof and convertible components under its contracts with its customers will almost certainly result in a loss of goodwill and damage its reputation with the OEMs.

Meteor's argument that Webasto is not subject to irreparable harm because it could have avoided such injury by paying Meteor's demanded increased price under protest is without merit. As courts in this district have routinely held, requiring a buyer to avoid harm by paying increased prices newly instituted by the seller does not preserve the status quo, the controlling objective of injunctive relief. *See, e.g., Cooper-Standard*, 568 F.

Supp. 3d at 853. Accordingly, the Court agrees that this factor weighs in favor of granting Webasto's motion.

The Court also agrees with Webasto that the remaining factors favor immediate temporary injunctive relief. The public interest is best served by the efficient administration of the automotive industry. *Id*. at 853-54 (collecting cases). The public interest is clearly served by avoiding consequential plant shutdowns and layoffs, which would result in economic woes for the state, region, and nation. *See Key Safety Sys., Inc. v. Invista, S.A.R.L., L.L.C.*, 2008 WL 4279358, at *13 (E.D. Mich. Sept. 16, 2008). Additionally, the public interest is served by requiring parties to abide by their contractual obligations. *Cooper-Standard*, 568 F. Supp. 3d at 854.

Because Webasto has shown a likelihood of success on the merits and that it will suffer irreparable harm if Meteor fails to deliver the Parts in accordance with the PO, Meteor must continue to deliver Parts to Webasto under the terms of the PO. No security pursuant to Fed. R. Civ. P. 65(c) need be posted by Webasto because it is not requesting any performance by Meteor other than what is set forth in the PO.

### IV. Conclusion

For the reasons set forth above, Webasto's emergency motion for TRO (ECF No. 6) is **GRANTED**. No security is required to be posted.

Meteor must immediately resume delivery of Parts to Webasto and otherwise fulfill its obligations under all current contract terms until further order of the Court.

Meteor may file an additional response brief to Webasto's motion for preliminary injunction by **January 21, 2026** and Webasto may file an additional reply brief by **January 28, 2026**. A hearing on the motion for preliminary injunction is scheduled for **January 29, 2026** at **1:00 p.m.** Proofs will be taken at that time if required by the parties, and the parties so notify the Court.

**IT IS SO ORDERED.**

Dated: January 16, 2026
at 6:57 P.M.

s/Shalina D. Kumar
SHALINA D. KUMAR
Presiding United States District Judge, acting in the absence of assigned United States District Judge F. Kay Behm