UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| WEBASTO ROOF SYSTEMS, INC. <br><br> Plaintiff, <br><br> v. <br><br> METEOR SEALING SYSTEMS, LLC, <br><br> Defendant. | Case No. 26-10141 <br> Honorable F. Kay Behm <br> Magistrate Judge Curtis Ivy, Jr. |

**ORDER ON PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION (ECF NO. 6)**

## I.      INTRODUCTION

This court granted Plaintiff Webasto Roof Systems, Inc. ("Webasto")

an emergency temporary restraining order ("TRO") to maintain the status

quo of an automotive parts supply chain pending the resolution of the

contract dispute between Webasto and its supplier, defendant Meteor

Sealing Systems, LLC ("Meteor").  (ECF No. 9).  The parties have

submitted supplemental briefing regarding Webasto's motion for

preliminary injunction.  (ECF Nos. 10, 11).  The court held a hearing on the

motion for preliminary injunction on January 29, 2026.  For the reasons set

forth below, the court **GRANTS** the motion for preliminary injunction.

1

## II.    FACTUAL BACKGROUND

Webasto is a Tier 1 automotive supplier providing sunroof and convertible systems to original equipment manufacturers ("OEM") including Ford Motor Co., General Motors, Stellantis, and Audi, among others.  (ECF No. 5, ¶ 9).  Meteor operates as a Tier 2 automotive supplier providing certain component parts ("Parts") essential to the manufacture of Webasto's sunroof and convertible systems.  *Id*. at ¶ 10.  According to Webasto, Meteor is the sole supplier of these Parts.  *Id*.

Meteor supplies the Parts to Webasto under the terms of the Purchase Order 605184 ("PO") and the expressly incorporated General Terms and Conditions of Purchase ("General Terms").  (ECF Nos. 5-3, 5-4).  The parties' contract also Individual Delivery Releases, i.e., regularly issued documents specifying the dates and quantities for the delivery of the Parts, which are incorporated into the PO.  (ECF No. 5, ¶ 11).  The PO includes provisions referred to as the "Supplier Framework Order" or "SFO".  *Id*.  Under the terms of the PO, "Webasto agrees to purchase between 65% to 100% of its requirements from [Meteor] for the duration of the" agreement.  (ECF No. 5-3).

On January 12, 2026, Meteor informed Webasto that it would immediately discontinue shipment of Parts unless Webasto agreed to pay a

100% price increase.  (ECF No. 5-8).  Webasto filed this action in state court the following day, claiming repudiation and breach of contract and seeking specific performance of the PO and temporary, preliminary, and permanent injunctive relief.  (ECF No. 1-2).  After Meteor removed the action to this court, Webasto amended its complaint and filed an emergency TRO motion and motion for preliminary injunction.  (ECF Nos. 1, 5, 6).  Without Parts from Meteor, Webasto's production lines will imminently shut down.  (ECF No. 5).  Without Webasto's products, OEM shutdowns are expected imminently as well.  *Id*.  The court granted the TRO on January 16, 2026, allowed for additional briefing and held a hearing on the motion for preliminary injunction on January 29, 2026.

## III.    ANALYSIS

Four factors are important in determining whether a preliminary injunction order is appropriate: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Cooper-Standard Automotive, Inc. v. Daikin America, Inc.*, 568 F. Supp. 3d 846,

3

850-51 (E.D. Mich. 2021); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).

### A.    Likelihood of Success on the Merits

A likelihood of success on the merits may be shown "if the plaintiff has raised questions going to the merits" that are "serious, substantial, difficult and doubtful" enough "to make them fair ground for litigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (internal quotations omitted). To prevail on its breach of contract claim, Webasto must establish "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am., NA v. First Am. Title Ins. Co.*, 878 N.W.2d 816, 829 (Mich. 2016) (citing *Miller-Davis Co. v. Ahrens Const., Inc.*, 848 N.W.2d 95 (Mich. 2014)).  The crux of the parties' dispute, and the critical issue in assessing whether Meteor has breached its contract with Webasto, is determining whether the PO constitutes a binding, ongoing "requirements contract," as Webasto argues, or a "release-by-release" agreement, as Meteor argues.

A requirements contract "is a contract that defines quantity by reference to the buyer's requirements." *MSSC, Inc. v. Airboss Flexible Prod. Co.*, 999 N.W.2d 335, 339 (Mich. 2023).  It is created by an "umbrella

4

agreement" that dictates the terms of future transactions, including the quantity ("the buyer will obtain a set share of its total need from the seller"). *Id*.  The buyer will then issue releases to inform the seller of its specific, short-term needs. *Id*. at 340.

In contrast, release-by-release agreements are agreements that generally "govern[ ] the terms of future contract offers."  *Id*.  "[T]he seller is bound by the terms agreed to in the purchase order when future releases are issued and accepted."  *Id*.  Release-by-release agreements are not, on their own, enforceable contracts.  A requirements contract obligates the buyer to make purchases from the seller, while a release-by-release contract allows either party to discontinue the relationship after individual transactions are completed.  *Id*.  A requirements contract must contain a suitable quantity term, while a release-by-release agreement's quantity term is supplied by each release.

Here, the parties' disagreement hinges on whether "65%-100% of its requirements" is a sufficiently specific quantity term to create a requirements contract.

Michigan courts have provided confusing, perhaps contradictory, guidance on what constitutes a suitably specific quantity term to create a requirements contract.  In 2020, the Michigan Court of Appeals determined

5

that a contract obligating the buyer to purchase between one part and 100% of buyer's requirements was a requirements contract.  *Cadillac Rubber & Plastics, Inc. v. Tubular Metal Sys., LLC*, 952 N.W.2d 576, 583-84 (Mich. Ct. App. 2020).  Although courts within this district have suggested that *Airboss* overruled *Cadillac Rubber*, *see, e.g., Ultra Mfg. (USA) Inc., v. ER Wagner Mfg. Co.*, 713 F. Supp. 3d 394, 398 (E.D. Mich. 2024); *FCA US, LLC v. MacLean-Fogg Component Solutions LLC*, 2025 WL 877534 (E.D. Mich. Mar. 20, 2025), a recent Michigan Court of Appeals case specifically rejects the view that *Airboss* irreconcilably conflicts with *Cadillac Rubber*.  *FCA US LLC v. Kamax Inc.*, 2025 WL 1420392, at *3-4, ___ N.W.3d ___ (Mich. Ct. App. 2025), *appeal granted*, 26 N.W.3d 430 (Mich. 2025).

> *Airboss* and *Cadillac Rubber* are distinguishable and do not conflict. The contract in *Cadillac Rubber* provided "that Buyer shall purchase no less than one piece or unit of each of the Supplies and no more than one hundred percent (100%) of Buyer's requirements for the Supplies." In *Airboss*, in contrast, the contracts contained no minimum term. Here, because the contract at issue requires FCA to purchase between 65% and 100% of its needs from Kamax, *Cadillac Rubber* governs, not *Airboss*. Under the reasoning in *Cadillac Rubber*, the purchase order's language providing for a quantity between 65% and 100% constituted a proper quantity term for a nonexclusive contract under MCL 440.2201(1). As a result, parol evidence can

6

be used to determine the parties' intent as to the existence of a requirements contract. We therefore conclude that *Cadillac Rubber* is the controlling authority.

*Kamax* specifically ruled that a term requiring a seller to provide between 65% and 100% of a buyer's needs constituted a proper quantity term under Mich. Comp. Laws § 440.2201(1) such that parol evidence can be used to determine the parties' intent as to the existence of requirements contract.

At the hearing, Meteor argued that despite the import of *Kamax*, the court must follow the *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400 (6th Cir. 2024) line of cases.  As explained in *Dieomatic Inc. v. Gen. Aluminum Mfg. LLC*, 2025 WL 2606039, at *5 (W.D. Mich. June 6, 2025) *Higuchi* and *Airboss* make clear that a blanket purchase order will not suffice as a specific enough quantity term to create a requirements contract.  The purported conflict between *Airboss* and *Cadillac Rubber* was addressed in *Ultra Mfg. (U.S.A.) Inc. v. ER Wagner Mfg. Co.*, 713 F. Supp. 3d 394, 398 (E.D. Mich. 2024).  However, then *Kamax* was decided. *Kamax* is a published decision and clarifies that *Airboss* and *Cadillac Rubber* are distinguishable on the basis that *Cadillac Rubber* included a minimum quantity term beyond just a blank purchase order.  *Dieomatic*, at *6.  As set forth in *Dieomatic*, "[t]he Sixth Circuit explained how courts

should analyze a conflict between a federal interpretation of state law (*Higuchi*) and a subsequent determination by an intermediate state court (*Kamax*):"

> Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Dieomatic*, at *6-7 (quoting *Hampton v. United States*, 191 F.3d 695, 701 (6th Cir. 1999) (cleaned up)).  Not only does the court have the benefit of *Kamax's* holding, but *Kamax* also explained that *Airboss* itself distinguished the facts of *Cadillac Rubber*.  Further, *Airboss* expressly declined to overrule *Cadillac Rubber*.  *Airboss*, 511 Mich. at 194 n. 4.  *Kamax* rejects the notion that *Airboss* even acknowledged a conflict between its decision and *Cadillac Rubber*; instead, it acknowledged a conflict between *Cadillac Rubber* and another unpublished decision from the Michigan Court of Appeals.  *Kamax*, at *4. Thus, the current[1] persuasive data from the

---

[1] To be sure, the Michigan Supreme Court has granted leave to appeal in *Kamax* to decide (1) whether *Cadillac Rubber* remains good law after *Airboss* and whether a written contract for approximately 65-100% of a buyer's requirements satisfies the statute of frauds.  However, at this time, absent a decision from the Michigan Supreme Court in *Kamax*, the court is left with the Michigan of Court of Appeals decision in *Kamax* as the most persuasive data on the issue. *See Garrett v. Akron-Cleveland Auto Rental, Inc.*, 921 F.2d 659, 662 (6th Cir. 1990) (Where a state appellate court has resolved an issue to which the high court has not spoken, federal courts should "treat

Michigan Supreme Court in *Airboss* is that it did not overrule *Cadillac Rubber* when it had the opportunity to do so and found no conflict between *Airboss* and *Cadillac Rubber*.  The court is thus persuaded, under *Hampton*, that it must follow *Kamax*, a published decision from the Michigan Court of Appeals.

Because *Kamax* held that "approximately 65%-100% of [buyer's] requirement" is a suitable quantity term, the court is satisfied that Webasto has raised questions going to the merits" that are "serious, substantial, difficult and doubtful" enough to satisfy the likelihood of success on the merits factor.

Meteor's other arguments are unavailing.  In its supplemental brief, Meteor points to a previous dispute between the parties where Meteor maintained that the parties' contract was a release-by-release contract and rejected Webasto's purchase order because it attempted to replace the parties "existing release-by-release purchase order with a requirements purchase order."  (ECF No. 10-2 and Ex. C).  Webasto then issued an SFO amendment that contained no language about Webasto's requirements or quantities to be ordered.  *Id*.  Meteor says that it asserted a continuing

---

[those] decisions . . . as authoritative absent a strong showing that the state's highest court would decide the issue differently.").

9

objection and reservation of rights to any attempt by Webasto to assert a requirements contract in any continuing business with Meteor.  (ECF No. 10-2 at Ex. A).  Webasto argues that it had not then, or at any time indicated that it was conceding that the parties did not have a requirements contract.  (ECF No. 11-3, ¶ 8).

Importantly, this is not the contract before the court and on which the TRO was based.  On September 5, 2025, Webasto sent to Meteor the "Purchase Order (Requirements Contract) 605184/20250904/0838" (the "2025 SFO") for the Parts used in production by Webasto.  (ECF No. 11-2, Ex. 3).  This SFO was attached to the Amended Complaint as Exhibit B (ECF No. 5-3) and with incorporated General Terms (ECF No. 5-4) was the Contract before the court when it entered the TRO.  Meteor never rejected the 2025 SFO and accepted by its silence and its performance under the Contract terms.  (ECF No. 11-3, Blakey Supp. Decl., ¶ 3 and General Terms § 2.3, ECF No. 5-4); *see Sundram Fasteners Ltd. v. Flexitech, Inc.*, 2009 WL 2351763, at *4 (E.D. Mich. July 29, 2009) ("One such manner of acceptance occurs when the offeree tenders performance.") (quoting *Kvaerner U.S., Inc. v. Hakim Plast Co.*, 74 F.Supp.2d. 709, 714 (E.D. Mich.1999)).

10

The 2025 SFO superseded any prior agreements because it covered the same subject matter.  *CMI Int'l v. Intermet Int'l Corp.*, 251 Mich. App. 125, 130 (2002) ("When two agreements cover the same subject matter and include inconsistent terms, the later agreement supersedes the earlier agreement.").  Thus, it is irrelevant whether the 2024 SFO was a requirements contract because the 2025 SFO is the governing agreement.

Meteor also asserts that the contract is not a requirements contract based on a mischaracterization of several of its terms.  First, it claims that "Meteor can reject any releases."  However, this claim is contrary to the provision in the General Terms that "Releases shall be binding, unless Supplier objects in writing towards Webasto within 48 hours upon receipt *due to unreasonableness of the quantities or the dates*, stating the earliest possible delivery dates." (General Terms § 2.2, ECF No. 5-4, PageID.121) (emphasis added).  Thus, Meteor cannot reject "any release."  Instead, it may reject and reschedule a particular release due to unreasonableness of the quantities or the dates, which is unrelated to the agreed pricing.

It also claims that "Webasto has no obligation to issue releases to Meteor."  However, this claim too is contrary to the provision in the 2025 SFO that "Supplier shall supply all Webasto's requirements for which Webasto issues Individual Releases and Webasto agrees to purchase

11

between 65% to 100% of its requirements from Supplier for the duration of the Delivery Agreement. (SFO)".  (ECF 5-3, PageID.109).  The SFO further provides that "Webasto shall communicate through Individual Delivery Releases the specific quantities, delivery dates and delivery locations . . ." *Id*.  Finally, Meteor claims that "Webasto may revoke an order any time without any liability towards [Meteor]."  This provision says, however, that Webasto may only do so "Prior to acceptance by the Supplier…".  (ECF No. 5-4, PageID.121).

Lastly, Meteor also argues that it had a right to terminate the contract because it was a "contract of indefinite duration" within the meaning of Mich. Comp. Laws § 440.2309.  Even if the contract were of an indefinite duration, an issue the court need not decide at this time, it still can only be terminated on reasonable notice, which means the time in which Webasto reasonably need to obtain a replacement supplier.  *Stackpole Int'l Eng'g, Ltd. v. Angstrom Auto. Grp. LLC*, 2018 WL 4679627, at *5 (E.D. Mich. Sept. 28, 2018) (citing UCC § 2-309, Official Comment 8, Reasonable notice normally means the period that "will give the other party reasonable time to seek a substitute arrangement."); *see also Aaron E. Levine & Co. v. Calkraft Paper Co.*, 429 F. Supp. 1039, 1050 (E.D. Mich. 1976) (Reasonable notice hinges closely on the amount of time necessary to

12

enable the distributor to look for a new source of supply).  Webasto has offered evidence that it cannot resource the Parts in time to avoid the irreparable harm of an immediate supply cutoff.  (ECF No. 8-2, PageID.350, ¶¶ 3-4).  Meteor has not offered evidence to the contrary.  Thus, the possible indefinite duration of the contract is no impediment to the issuance of a preliminary injunction.

Meteor has not overcome the court's prior conclusion that because *Kamax* held that "approximately 65%-100% of [buyer's] requirement" is a suitable quantity term, the court is satisfied that Webasto has raised questions going to the merits" that are "serious, substantial, difficult and doubtful" enough to satisfy the likelihood of success on the merits factor.

### B.    Irreparable Harm and Other Factors

In addition to establishing a likelihood of success on the merits, plaintiffs seeking injunctive relief must demonstrate that they are likely to suffer irreparable harm in the absence of preliminary injunctive relief, that an injunction will not result in substantial harm to others, and that an injunction is in the public interest. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024). "A showing of probable irreparable harm is the single most important prerequisite to granting injunctive relief." *Cooper-Standard*, 568 F. Supp. 3d at 852 (quoting *Lucero v. Detroit Public Schools*,

160 F. Supp. 2d 767, 801 (E.D. Mich. 2001) (cleaned up).  A party's harm is "irreparable" when it cannot be adequately compensated by money damages. *Id.*

"The 'just-in-time' nature of the automotive supply chain provides potential for large-scale disruption if just one of the down-line companies is unable to fulfill its obligations under contract." *Id.* at 853.  "[T]he potentially catastrophic effects of a disruption in the supply chain of automotive parts is well established in the case law of this court." *Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2012).  Irreparable harm is found where a plaintiff's goodwill and business reputation would suffer absent injunctive relief.  *See TRW Inc. v. Indus. Sys. Assoc. Inc.*, 47 F. App'x 400, 401 (6th Cir. 2002).

Webasto asserts that, without Parts from Meteor, its own assembly lines will shutdown which, in turn, will cause the almost immediate shutdown of its OEM customers' assembly lines.  Webasto's inability to supply sunroof and convertible components under its contracts with its customers will almost certainly result in a loss of goodwill and damage its reputation with the OEMs.

Meteor's argument that Webasto is not subject to irreparable harm because it could have avoided such injury by paying Meteor's demanded

14

increased price under protest is without merit.  As courts in this district have routinely held, requiring a buyer to avoid harm by paying increased prices newly instituted by the seller does not preserve the status quo, the controlling objective of injunctive relief.  *See, e.g.*, *Cooper-Standard*, 568 F. Supp. 3d at 853.  Accordingly, the court agrees that this factor weighs in favor of granting Webasto's motion.

The court also agrees with Webasto that the remaining factors favor injunctive relief.  The public interest is best served by the efficient administration of the automotive industry.  *Id*. at 853-54 (collecting cases). The public interest is clearly served by avoiding consequential plant shutdowns and layoffs, which would result in economic woes for the state, region, and nation.  *See Key Safety Sys., Inc. v. Invista, S.A.R.L., L.L.C.*, 2008 WL 4279358, at *13 (E.D. Mich. Sept. 16, 2008); *see also Almetals Inc. v. Wickeder Westfalenstahl, GmbH*, 2008 WL 4791377, at *10 (E.D. Mich. Oct. 29, 2008) ("Denying the injunction places at risk the operations at Almetals, and, correspondingly, numerous customer assembly plants. This would be disastrous, irreparably damaging Almetals' business and reputation, and causing further detriment to the economy.").  Additionally, the public interest is served by requiring parties to abide by their

contractual obligations.  *Cooper-Standard*, 568 F. Supp. 3d at 854; *Alsmetals*, 2008 WL 4791377, at *10.

Because Webasto has shown a likelihood of success on the merits and that it will suffer irreparable harm if Meteor fails to deliver the Parts in accordance with the PO, Meteor must continue to deliver Parts to Webasto under the terms of the PO.

## IV.   CONCLUSION

For the reasons set forth above, Webasto's motion for preliminary injunction (ECF No. 6) is **GRANTED**.  Meteor must continue to deliver Parts to Webasto and otherwise fulfill its obligations under all current contract terms until further order of the court.  Pursuant to Federal Rule of Civil Procedure 65(c), the court **ORDERS** Plaintiff to post a bond in the amount of $261,295 and in the amount of $261,295 per month on the first day of each month until this Order expires or is vacated.

**IT IS FURTHER ORDERED** that this order is conditioned on, pursuant to Local Rule 67.1, Plaintiff's filing with the Clerk of the Court a bond in the amount of $261,295, to be held in a non-interest-bearing account, no later than February 9, 2026, to secure the payment of such costs and damages not to exceed such sum as may be suffered or

16

sustained by any party who is found to be wrongfully restrained hereby.

**SO ORDERED.**

Dated: February 5, 2026                    s/F. Kay Behm
at 9:53 A.M.                               F. Kay Behm
                                          United States District Judge